Our third case this morning is No. 22-14-45, Monterey Research, LLC v. STMicroelectronics. So this case involves the question of whether the patent fee is appropriate according to both of the IPRs. For present purposes, without asserting that question, we're going to let you argue those issues. Thank you, Your Honor. Okay. Mr. Norisi? Thank you, Your Honor. I didn't fully hear what the court said with respect to the issue of the ability for the ST to participate in the 1499. We're going to let them argue without deciding the question of whether they're formally appropriate. I understand. Thank you, Your Honor. You can revert on this appointment. Well, they didn't go through that route, but I understand, Your Honor. Thank you, and may it please the Court again. In this appeal, we have two separate IPR proceedings directed to the same patent, and in both instances, the evidence does not support the Board's determinations of unpatentability, and I think ultimately that demonstrates the non-obviousness of the invention, the fact that these different references, whether as anticipation or obviousness, do not ultimately reach the claims. With respect to the first IPR, the Board started off with a procedural error in that it relied on the combination of WADA and Barrett to meet the predetermined number limitation, whereas the petitioner consistently had only argued that that limitation was met based on WADA alone, and I think it bears focusing on that issue because if indeed the Board is restricted to WADA alone with respect to the predetermined number limitation, the Board's own findings demonstrate that the petition could not prevail with respect to the first IPR. To the extent the Court is inclined to look beyond WADA alone and consider the combination of WADA and Barrett that the Board raised with respect to the predetermined number limitation, the problem is that the Board's combination only addresses part of WADA's shortcoming. The Board's decision itself at Appendix 13 and 19 acknowledges that neither of WADA's two embodiments on their own have any lower bound or upper bound. Okay, so the Board relied on the second embodiment and it found that the existence of four multiplexers defined an upper limit, right? That was the Board's assumption. And there is testimony to that effect by the expert? There is testimony from the expert that that's how the expert views it, but there's no support in WADA for such an understanding. And so the difference, the distinction that we highlighted and that the Board failed to address is between a sort of number of states and the number of actual addresses generated. In the case of the four multiplexers, we can think of it like cylinders in a car. Your argument is they could keep recycling it and that would produce more than four. So four multiplexers are four devices, right? And the fact that there are four devices doesn't tell us anything about when the system as a whole stops generating address signals. It's like there are four cylinders in a car. That doesn't tell us how many times each of them combusts. When the car is running, it just means there are four cylinders. And to go from the fact of four multiplexers to the conclusion of a system in which four addresses are generated and then you stop. But this one's expert said it showed four. It stopped at four. Fair enough, Your Honor. I think the problem in light of that evidence is that we submitted contrary evidence that was not addressed. And so the Board only weighed and considered one-size evidence and agreed with it without addressing why it is that our detailed testimony and explanations were not adequate to show otherwise. With respect to the non-interruptible limitation, the Board relied on the combination of WADA and Barrett in a fairly unusual way. It said that it's not taking any teaching at all from Barrett as to non-interruptible. It's only taking the so-called particular desire to make address signal generation non-interruptible. And then the Board said once a person of skill is armed with that desire from Barrett, then WADA would somehow effectively magically become non-interruptible. But there was no explanation from the Board as to how that would actually happen  And the distinct requirement of a reasonable expectation of success, partly because of the motivation to combine, is something that this Court's precedents have repeatedly held the Board is required to address and consider. How does your patent make this first uninterruptible? Your Honor, I think that's... The patent doesn't explain, so I'm just wondering what exactly has happened. I understand, Your Honor. Holding the ADV signal high, maybe? Not quite, not exactly like that. So let me give you some citations for this point. Appendix 1143-44, Appendix 1221, Appendix 3556-57, for instance. In these various locations, as well as in our blue brief, you'll see the following explanation. What the patent teaches is that if you program the number of address signals you want generated through pulses into the burst clock ahead of time, then you can go along and have the system know in advance how many it needs to generate. That's the predefined number. Once you've solved the predefined number issue, now you no longer need any interrupt mechanism like the prior art did. Because the interrupt mechanisms that were there in the prior art are there because there is no predefined number. There needs to be some way of starting and stopping. And so because we figured out a way how to create a predefined number by programming the pulses into the burst clock, we obviated any need for an interrupt mechanism and we allowed the system to become non-interruptible. And so our expert explains that once a person of skill sees the teaching of the 134 patent with respect to the programming of the burst clock with pulses to generate the predefined number, then they know how to create the non-interruptible part. But without the teaching as to the pulses and achieving the predefined number independent of some external control signal, then they would not know how to achieve the non-interruptible limitation. And that's really the dichotomy. So where the board... Did your expert say either this is some unpredictable art or when looking at the teachings of Wada, I would not know how to make that burst uninterruptible? Yes, our expert did say that. Where did the expert say that? I saw the expert say Wada is in this kind of context. Barrett is in this other context. Wada is synchronous. Barrett is asynchronous. But I did never see the expert actually connect the idea that once a skilled artisan was motivated to make a non-interruptible burst signal, they would be confused or lost or very uncertain about how to make that happen. Your Honor, we did make that point. Let me give you some citations if I could. While I pull up the citations, I'll just articulate that effectively what the expert said is that since in Wada, you are reliant on the external control signal and you're not able to generate any predefined number, there is also no way of achieving non-interruptible in Wada without some significant modifications. Let me give you a reply brief at page 21. We gather citations for this point. We explained that we challenged the Wada-Barrett combination as not enabled below, and we cite Appendix 1160-62, Appendix 1269, Appendix 1293-99, and Appendix 3727-29. These are all places where we discussed why it is that Wada and Barrett, based on their own teachings— Are these sites where I'll see what your expert said? That you wouldn't be able to, with any degree of reasonable certainty, make the Wada burst non-interruptible? Yes, some of them are. Half of them are to our brief and half of them are to the expert. So the theory is that it couldn't make it non-interruptible because there's no disclosure of a predetermined number? That is part of the theory. Well, certainly the first part is that Wada doesn't achieve non-interruptible at all, and the second part is what you're on about. So to conclude that Wada does disclose a predetermined number, then there's no problem with non-interruptible? No, not quite, Your Honor. I understand why my argument may have suggested that. So our patent teaches a particular way of achieving the predetermined number, which I articulated with the pulses and the burst clock. That's what also allows non-interruptible in the scope of our invention. To the extent that prior artists seem to have taught other ways of achieving a predetermined number— the combination still doesn't teach non-interruptible. Where does he stay? Your Honor, this was a focal point in the prosecution history where the prior art that was brought up— So the expert doesn't say that? I believe he does. I think the same citations that I already provided support that point as well. So I'm happy to go to them. That doesn't work. You guys are not aware of it. Well, it's the same issue, so that's why I'm relying on the same citation. Okay, so for example, 3727 is our expert's testimony, I believe. So in 3727-29, the expert talks about the differences between WADA and Barrett and their incompatibility. This isn't the expert testimony. This is your brief. Oh, I'm sorry. So 1293 and 1299. In particular, we can look at 1294. The title of this section is that a person of skill would not expect the combination to succeed. And then 1294 at paragraph 180, the expert talks about reasonable expectation of success with respect to the combination. And then it goes on through 1299 to get into the details of— Okay, but you're not able to point to me right now where he says even if WADA disposes of a predetermined number, the combination doesn't show non-interruptible. I don't have that citation for you offhand. I can provide it. It's certainly in the record because it's an argument that was made both during the prosecution and during the IPR repeatedly, that these are distinct requirements and that although the prosecution arc purported to show predefined numbers, the claims were actually allowed because the examiner agreed that the arc did not separately show non-interruptible. I would also like to very briefly address Schaefer, if I may. I think the issue with Schaefer is actually quite straightforward. In Schaefer, the connection between the prohibition on the next command and the timing is with respect to the point at which auto-precharge is employed. That's what Schaefer itself says at column 7, lines 40 to 47. And the time when auto-precharge is employed is as of time 6, which is in the middle of the burst. And that leaves the time from T2 to T6 interruptible, not non-interruptible. I guess the question is whether there's some ambiguity about the auto-recharge being issued and whether now you can't have any intervening commands once it's issued. And if it's issued at T2, then maybe you can't do anything between T2 and T9. That was the board's sort of general understanding. What's wrong with that is that the explicit language of Schaefer that the board relies on ties the starting point of this non-interruption effect to the time when auto-precharge is employed. In the figure, they have all these little NOP symbols between T2 and T9, T6. And NOP stands for no operation. And the board relied on that as further evidence that, in fact, you wouldn't have any interrupting commands. What's your understanding of NOP, no operation? My understanding is that the only thing that's special about figure four, according to what was at the time Qualcomm, the only thing that's special about it is this auto-precharge feature. And the only issue that everyone agrees is when does the auto-precharge kick in to prohibit the interruptions. And that, in turn, everyone agrees depends on when the auto-precharge is actually employed. And the auto-precharge is employed at T6. So those NOPs – Yeah, what are – can you just tell me what your best understanding of those NOPs are? That was not an issue the other side raised in their briefing, so I don't think that – it's not something that was the focus of the appeal, respectfully, Your Honor. I would like to address it, but it's not something that we had an opportunity to address in the briefing. Okay. Thank you, Norm. Thank you. Okay. Thank you. We need a few minutes for a follow-up. Mr. Bowman? Good morning, Your Honors. May it please the Court? This is a substantial evidence case, Your Honors, and the record shows that there is substantial evidence to support the Board's findings of unpatentability and that Monterey's other arguments lack merit. I want to begin, Your Honors, with the point about the supposed new theory that the Board raised. This is an argument that Monterey made at the end of the proceedings as we rounded into appeal, and just to be entirely clear, the position that the Board took at Appendix 24 is laid out at Appendix 124 in the petition. When the petitioners filed, they had some inkling that Monterey would argue that a burst was terminated before it was completely processed. And so they put in the petition, to the extent that Patent Owner argues that a burst is interrupted, that it is not completely processed, you do a combination with Barrett. That's what the Board accepted, and it's been a part of this proceeding since the petitions were filed. In any event, even if this were some kind of a new argument to Monterey, it had almost a year to address the issue after the institution decision, and it did in the briefing. The parties talked about it at length, and the issue was addressed by both sides as the IPR proceedings played out. In any case, Your Honors, this is an argument that was forfeited by Monterey because it never said anything to the Board at all about how it was raising a new theory in the institution decision. I'm not surprised by that, given the disclosures that are in the petition at Appendix 124, but there was no effort at all to say to the Board in any way, shape, or form that it was improper to raise this particular issue. And as such, Monterey failed to extinguish its administrative remedies and has therefore waived the argument. Are there any questions I can answer for the panel relating to that specific issue about the supposed new theory? So, Your Honors, let me move on to WADA then. WADA discloses a second embodiment that I believe Judge Dyke mentioned a few moments ago, and in that embodiment, WADA itself describes that you have these four multiplexers. When the device gets a chunk signal, an internal address chunk signal, it takes the outputs of those four multiplexers in succession, and those become the burst. The patent says, and just to be specific, Your Honors, at Appendix 488 and 89, this is WADA, column 15, line 66 to column 16, line 3. This was cited by the Board in its decision on Appendix 24. You're using the four multiplexers in succession, and it says those four multiplexers are 60A through 63A. I think I have that right. It may be 60A through 60D. Actually, Your Honors, I will turn there to make sure that I don't lead you astray. One moment. Go ahead. So, Your Honor, it says that you use the multiplexers 60A through 63A. Now, there's a 60A, there's a 61A, there's a 62A, there's a 63A. Four. Not fewer, not more. But that's not the only disclosure in WADA that's relevant. If you look at Figure 4 and just turn back a few pages, I believe that's Appendix 468. This is the signaling diagram that goes together with the WADA second embodiment. And you can see at the imt.cha line and the output line, which is labeled DO, there are two bursts, and those bursts both have exactly four internal addresses. Not more, not fewer. There is no disclosure in WADA whatsoever of having more or fewer for the second embodiment. So we submit, Your Honors, that there is substantial evidence, at least as to the second embodiment, to support the Board's conclusion and ask for affirmance on that thesis. There was also a suggestion that the Board didn't take into account the evidence that Monterey had submitted with regard to there being early termination of WADA's burst or that it might go on infinitely. That's not correct either. If you look at Appendix 23 and 24, the Board says, having taken into account all of that evidence, that it's not an arbitrary disclosure as to burst length in WADA's second embodiment. It's tied to the four multiplexers where you have exactly four addresses. Your Honors, if I could turn just for a few minutes to the modification argument. I don't think that there is a dispute here that Barrett disclosed a non-interruptible burst. I also don't think that there's any dispute here that there was a motivation to take those teachings and incorporate them into WADA. The question is whether and how a person of ordinary skill in the art would do that. It was entirely predictable, routine, and trivial to take the idea of a non-interruptible burst and put that into WADA. That's reflected in at least three ways. Number one, it's known in the art. Barrett shows us that a non-interruptible burst is known. Number two, if you look at the specification of the 134 patent, it mentions the word non-interruptible outside of the claim exactly six times, and it doesn't explain how it is that you make a burst non-interruptible. It just says that there is a non-interruptible burst. That's evidence, if the patent is fully enabled, that a person of skill in the art doesn't need the details of how to do that because it's already known. It's predictable. It's trivial. It's routine. One step beyond that, it is true that Monterey says, we have this burst signal disclosure that is in the patent where you're sending these pulses and therefore generating addresses. If that is a way to get a non-interruptible burst, which is what Monterey's position is, it's expert said in no uncertain terms outside of the scope of the patent, in the abstract, generically, that that was something that a person of ordinary skill in the art would understand how to do at the time of the alleged invention. It's not tied to the patent specification. It's just in the general knowledge of the art. We're not talking about a complicated affair here. We're talking about programming a signal so that you have a certain number of bursts. That was something that was well within the scope of the knowledge of a person of ordinary skill in the art at the time of the invention. Are you referring to the deposition testimony of the patent owner's expert when he's talking about pulse circuit design in general that was cited by the board? I am, Your Honor. That's exactly what I'm referring to, and that's at appendix 3554 through 3560. If I could, I'll just point the board to two portions of that that I think are particularly important. The court. I'm sorry. Thank you, Your Honor. I mean, I know you guys recycle and save margins, but it is a different topic. Absolutely, Your Honor, and I apologize for that. If I could say to the court and just point out two portions of that testimony, on appendix 3554, the expert says at line 10, in the abstract, and then goes on to say that a person of skill in the art would know how to make something that puts out that number of pulses. And on appendix 3556, starting at line 4, the expert clarifies that his answers in the last couple of minutes, they were just about a person of ordinary skill in the art knowing how to generate a circuit that can produce four pulses or eight pulses. That wasn't tied to the patent at all. It's about that testimony in the abstract and what a person of skill would know. Unless there are any questions, Your Honors, I do want to give my colleague from the Patent Office some time to argue as well. Okay. Thank you, Mr. Rollins. Thank you, Your Honors. Mr. Stallworth. Does the PTO think STM should be a party to the Schaefer appeal? The PTO does not think that the court has to answer that question because fortunately… What about intuitive surgical? Are you familiar with our court's opinion in intuitive surgical? The PTO's position, Your Honor, is that… Are you familiar with this court's opinion in intuitive surgical? It's pretty fresh. I have not specifically read it for this preparation for this hearing. It says once a party is collaterally stopped under section 315E, they're no longer a party to the case. It takes effect immediately once the final written decision issues in a different IPR proceeding. I think Your Honor is more capable of explaining this court's case law than I am. Oh. Okay. So just so I can get it on the record, the PTO has no view on whether STM is a proper party in the Schaefer appeal. In this specific appeal… You're here for a reason. Yes. But the PTO is stating no position on that specific issue in this specific appeal because this court doesn't need to reach it precisely because the PTO is here to defend the board's decision in that issue in the 1771 appeal. So it's a moot issue. It's a moot interest in the outcome of the Schaefer appeal if they lose on the other end. But this court… Never mind. Okay. Just go ahead with Schaefer. Thank you, Your Honor. Good morning, and may it please the Court. Peter Sollard on behalf of the USPTO Director. In the 1771 appeal, there is only a single issue as to whether Schaefer discloses that the burst read or write with auto pre-charge is non-interruptible. It is a question of fact that this court reviews for substantial evidence what the prior art teaches, and the board clearly explained why the burst with an auto pre-charge in Schaefer is non-interruptible. It's correct and more than supported by substantial evidence. As the board explained in reference to figure 4, the auto pre-charge is issued at time T2 along with the read command. It is not a separate command. So the distinction that my friend tried to draw between issued and employed isn't correct because the relevant passage that the board relied on at APPX 4564 makes the distinction between issuance of a command and performance within the SDRAM clear. It says, by using the auto pre-charge command feature, a manual pre-charge command does not need to be issued during the functional operation of the SDRAM. The auto pre-charge command ensures that the pre-charge is initiated at the earliest valid stage within a burst cycle. And then this was the key line that the board relied on. It's the user who's prohibited. The user is not allowed to issue another command until the pre-charge time is completed. And so the clear teaching of the text here in Schaefer is that the prohibition applies to the user. The user issues the read or write with the auto pre-charge at time T2, and the user cannot issue any other command until the pre-charge time is completed. Therefore, the entire span of that operation is uninterruptible, and that's further supported by the description of using no-ops and the command line during that entire sequence period to ensure that no other command is issued. I think that the PTO has gone through the operation of Schaefer, the specific commands, the timing, the diagram, and explained exactly the issue I've just gone through, that the key is that the read or write with auto pre-charge is one command that happens at one time that's issued by the user. And then Schaefer says the user doesn't get to do anything else until that's done, and therefore the burst must be non-interruptible in the terms of the claims as the board found. Under auto pre-charge or under pre-charge, the TRP, the pre-charge time is between T6 and T9, right? That is correct, Your Honor. So is there an explanation why we would also want to preclude any commands between T2 and T6 under the auto pre-charge scheme? What's the purpose of that? Well, the entire purpose of having this type of burst operation is that it's pre-defined. So it's known that it's going to be a forward burst in the example that's in Figure 4. So the entire system is set up to allow for that fixed number of addresses to be generated and used to read or write data, and then automatically complete the pre-charge that will reset the device for the next operation. There's no point to allowing an interruption. It would create more complications. But isn't the point that if you did have an interruption, it would interfere with the first command? It would, Your Honor. And the advantage of the auto pre-charge is that you're setting up a certain command sequence in advance because you know you don't want to interrupt it. Between T6 and T9. At any time during that sequence, Your Honor. Because that's specifically what Schaefer says. It says once the user issues one command, which will cause two things to happen, the read and the pre-charge. Once the user issues that, he can't do anything else until after the pre-charge time is complete. Okay. Thank you. Thank you. We have two minutes to respond. Your Honors, I'd like to start by providing those appendix sites that were requested and then those directly relate to the issues that were raised in the opposing argument. So with respect to Judge Dyke, appendix 1260-69 contains our expert testimony where the expert talks about why WADA would not be non-interruptible and would not have a reasonable expectation of success in response to your question. Judge Chen, with respect to the NOP, there's a detailed discussion of that across about seven or eight pages at appendix 5277-84. And as I generally recall, the basic answer to your question is that the NOP exists in both figure 2, where there's only pre-charge, and figure 4, where there's auto pre-charge. And we know that figure 2 with pre-charge is interruptible. That's conceded. And the NOP exists at the same points in time that it exists in figure 4. So therefore, we know that the NOP does not render anything non-interruptible. If anything changes the interruptibility, it's the auto pre-charge feature, and the whole dispute is just about when does that kick in. In terms of the issue of when it kicks in, appendix 4564, and it's discussed at our reply brief at page 27, has explicit language from Schaefer that explains the auto pre-charge is employed or issued at time T6. It's not at time T2. They are two distinct times. There's a time where the command issues with the read-write. That's T2. There's a time where the auto pre-charge is employed. That's at T6. And finally, the expert stated that a person of steel would know how to build the burst clock of the invention once they've seen the teachings where the patent says use pulses to program the burst clock. The expert made clear, however, that that idea of using that existing tool of pulses, of being programmable, was novel to the 134 patent in terms of utilizing that to create a predefined number of address signals that would be non-interruptible, and that's the distinction. Okay. Thank you. Thank you. I'll pass on the case.